## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JOHN DOE,

      Plaintiff,

    v.                           Case No. 20 CV 7293

LOYOLA UNIVERSITY-CHICAGO,

      Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, and the Law Offices of Damon M. Cheronis as and for his complaint against Defendant Loyola University-Chicago (the "University" or "Loyola"), respectfully alleges as follows:

### THE NATURE OF THE ACTION

1. This action arises out of an egregious miscarriage of justice against Plaintiff, a male undergraduate student at Loyola, through Loyola's rushed, flawed and biased Title IX sexual misconduct process in the midst of the COVID-19 pandemic, carried out under the presumption of guilt in an attempt to use Plaintiff as a scapegoat to make up for Loyola's long history of failing to adequately respond to sexual assault allegations against males.

2. Complainant Jane Roe[2] (hereinafter "Complainant or "Roe") used Plaintiff as a ploy to bolster her anti-male, anti-rape stance in the height of the #MeToo era amongst her peers,

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

fabricating allegations of nonconsensual sexual intercourse after a completely consensual encounter with Plaintiff. Roe's fabrication was evident in her ever-changing accounts of the night and inconsistencies between her stories and the evidence submitted. Yet, the University investigator never raised concerns about Roe's credibility nor was her account ever questioned. Instead, Roe was presumed to be credible from the start.

3. From inception, Loyola's Title IX investigation and disciplinary process was flawed, biased, and deficient. Throughout the Title IX disciplinary process, Plaintiff was subjected to unfair and gender-biased treatment: Plaintiff was presumed guilty from the start; Defendant resolved all factual inconsistencies in favor of Roe's claims, despite the patent evidence of credibility issues; evidence bearing heavily on Roe's credibility was not considered or given proper weight; Defendant failed to interview relevant witnesses to corroborate Roe's story; and, overall, the investigative report was tailored towards a predetermined outcome of finding Plaintiff guilty as a male accused, regardless of the actual facts of the case.

4. Moreover, Defendant used the COVID-19 pandemic as an opportunity to deprive Plaintiff of the opportunity to be heard in the same setting as Roe, denying Plaintiff's request to postpone the investigation so that he could have an in-person interview, as Roe had already been given. The investigator used these varied interview settings as a basis to conclude that Plaintiff was not personable or credible, even though his interview was done via Zoom with the investigator's feed constantly lagging and dropping.

5. As a result of this flawed process, Plaintiff was found responsible for nonconsensual sexual intercourse and sanctioned to a one-year suspension, forever marring his educational file with an improper and damaging finding and sanction, despite the fact that Plaintiff

only had 9 credits left to complete his degree and the entire upcoming semester would be held remotely due to the pandemic.

6.      By employing gender-based, pre-determined presumptions of Plaintiff's guilt from the outset, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

7.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at Loyola.

8.      Defendant engaged in a biased, flawed, and deficient investigation and disciplinary process, which rendered a finding and sanction that were arbitrary, capricious, unreasonable, fundamentally unfair, and not supported by sufficient evidence.

9.      As a result of Defendant's discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

10.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

11.     Plaintiff is a natural person and a resident of Kansas. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student at Loyola.

12.     Defendant Loyola University-Chicago is a partially federally funded private university located in Chicago, Illinois, where it maintains its principal offices and place of business.[3]

---

[3] Information concerning the amount of annual federal funding received by the University is not publicly available.

## JURISDICTION AND VENUE

13.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over Defendant Loyola University-Chicago on the ground that it is conducting business within the State of Illinois.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      BACKGROUND.**

      **A.    The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

16.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

17.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

4

18.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

19.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

20.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

21.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16).

22.     The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

23.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

24.     Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

25.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

26.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and

resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 9,12.

27. The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

28. In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, the document states that schools:

    a. "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

    b. may decide to eliminate all opportunities for "cross-examination" (p. 31); and

    c. must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

29. Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

30. In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further

advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

31.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

32.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

33.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct. In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . . It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention. Neal explained that "schools are

running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendant instead."

34.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings. *See* Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them. Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id*.

35.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students. *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529. For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

36.     Notably, a recent study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates, and has no negative impact on securing donations. *See* Jason M. Lindo et al., *Any Press is Good Press?*

*The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

37.     The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id.*  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid*.  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

38.     Colleges and universities, including Loyola, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Loyola, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**B. The 2017 Revocation of the DCL and Loyola's Refusal to Update its Policies Accordingly.**

39.     On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

40.     DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

41.     Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

42.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

43.     On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

44.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

45.     In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

46.     The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.

47.     The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  *Id*. at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints."  *Ibid*. (emphasis added).

48.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case."  *Id.* at 4 (emphasis added).

49.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

50.     Likewise the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.  *Id*. at 4; *see also id*. footnote 19 at 4.

51. The 2017 Q&A suggests that the policies and procedures in place at Loyola at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

52. Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Loyola administrators, including Timothy Love, the University's Title IX Coordinator, stated that Loyola would not change its policies and procedures. *See Loyola reaffirms commitment to Title IX,* Office of Student Conduct & Conflict Resolution, *available at* https://www.luc.edu/osccr/resources/equity-baseddiscriminationandmisconductservicesincludingtitleix/loyolareaffirmscommitmenttotitleix/.

53. On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

54. Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs including Loyola have mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

55. In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "*Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct.*" (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute

"the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

56.     In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

57.     On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

58.     The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

59.     The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

60.     In stark contrast to previous guidance, the 2020 Title IX Final Rule specifies that colleges are only required to pursue Title IX allegations that occur during an institution's education program or activity over which the institution exercised substantial control over both the respondent and the context in which the alleged sexual harassment occurred, leaving off-campus conduct beyond the scope of Title IX jurisdiction.

61.     Following the *Davis*[4] standard outlined by the Supreme Court, the 2020 Title IX Final Rule also narrows the definition of sexual harassment, now defined as unwelcome conduct, on the basis of sex, "determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," as opposed to the previous administrative guidance definition of "severe, pervasive, *or* objectively offensive." This standard was adopted to "ensure the imposition of consistent requirements in judicial and administrative contexts." *See* Defs' Opp. To Mot. For Prelim. Inj. 23, *Pennsylvania v. DeVos*, No. 1:20-CV-01468 (CJN), 2020 WL 4673413 (D.D.C. Aug. 12, 2020).

62.     Further, the 2020 Title IX Final Rule permits universities to choose between the clear and convincing standard and the preponderance of the evidence standard when determining student and faculty responsibility.

---

[4] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

63.     Notably, the 2020 Title IX Final Rule prohibits the use of the single-investigator model relied upon by many universities, including Loyola, wherein a single individual both investigates and adjudicates the claim.

64.     Under application of the new Title IX regulations, Plaintiff was deprived by Loyola of numerous procedural rights. By way of example and not limitation, the 2020 Title IX Final Rule states that schools must:

a.  Notify respondents that they are presumed innocent until a finding of responsibility is made;

b.  Provide the accused with a hearing before any finding of responsibility is made or sanctions are imposed;

c.  Provide the accused with the right to a live hearing with cross-examination of all witnesses. Such cross-examination must be done directly, orally, and in real time by the party's advisor of choice, who may be an attorney;

d.  Objectively evaluate all relevant evidence, both inculpatory and exculpatory;

e.  Avoid credibility determinations based on the status of a student as complainant or respondent;

f.  Train school decision-makers and investigators on issues of relevance and bias;

g.  Provide equal opportunities to the complainant and respondent to present facts;

h.  In the event that a respondent is determined responsible for a policy violation, provide the respondent with a written notice of determination, including the rationale for the determination, and any disciplinary sanctions imposed.

65.     On information and belief, Loyola has acknowledged its procedural shortcomings in light of the new regulations as evidenced by its updating of the Policy as of August 13, 2020.

### C. Loyola Faces Years of Complaints for Failure to Address Claims of Sexual Assault and Harassment Allegedly Committed by Male Students and/or Faculty.

66.     Right before the DCL was rescinded, Loyola was under heavy fire for its alleged failure to properly respond to and redress female students' claims of sexual assault and sexual harassment by male students and/or faculty.

67.     Loyola has attempted to remedy these criticisms by complying with complainant's demands in the hope of making up for its historical inadequacies in responding to sexual assault allegations.

68.     In 2016, students, upset with Loyola's "downplaying" of sex crimes on campus, called on the University to speak up about the issue. Students also requested that the University provide more victim-centered resources to students, in addition to police hotlines. *See* Linzie Rice, *Loyola Needs to Speak Up About Sex Crimes on Campus, Students Say,* DNA Info Chicago (Oct. 4, 2016).

69.     Just a few weeks later, Loyola's incompetence was demonstrated when Love (on behalf of the Office of Dean of Students) admitted to losing a student's sexual assault complaint. After an apologetic conversation with the student, the student requested a no-contact order. Love attempted to make up for this major error by granting the no-contact order within hours of the conversation with no further information or investigation, as the report still had not been found at that point. *See* Trisha McCauley, *Student's Sexual Assault Report Gets Lost in System,* Loyola Phoenix (Oct. 26, 2016).

70.     This incident sparked outrage across campus, with multiple students posting on social media regarding Loyola's mishandling of several sexual assault cases during the fall of 2016 alone. The University responded by stating that the criticisms were "absolutely untrue" and that

they were "mistakenly directed at the Office of the Dean of Students." Nevertheless, the University vowed to "demonstrate" its commitment to addressing allegations of sexual assault, and provided various resources for "survivors," but notably none for respondents. *See DOS Responds to Social Media,* Office of the Dean of Students.

71.     In response to the University's silence, a group of Loyola students interrupted the inauguration of the University's President in protest of the University's mishandling of sexual assault allegations by marching into the ceremony with their mouths taped shut while holding up a blood-stained sheet which read "silence is violence." *See* Press Release, *Loyola students interrupt inauguration, protest University handling of sexual assault,* Windy City Times (Nov. 7, 2016).

72.     The students, in a written statement, stated that Love was "hired to handle sexual assault" on campus, yet the University had continued to mishandle and act indifferently towards sexual assault allegations. The statement called for the "fir[ing] of Tim Love, the current Title IX coordinator, for continuing to mishandle sexual assault cases," as well as a public apology from the University for "downplaying…the growing epidemic of rape culture." *Id.*

73.     The students' statement also criticized the University's new President, Jo Ann Rooney, for her record of handling sexual assault. *Id.* Rooney had previously come under fire in her role as an advisor in the United States Department of Defense for her response to the handling of sexual assault in the military. Rooney opposed having a judge advocate outside of the chain of command, stating that it would result in "decisions based on evidence rather than the interest in preserving good order and discipline" which would "result in fewer prosecutions and therefore defeat the very problem that I understand it seeks to address." Sexual assault victim advocacy groups responded by calling for a hold on Rooney's nomination because of her comments. *See*

Jennifer Hlad, *Testimony from Navy undersecretary nominee raises eyebrows,* Stars and Stripes (Oct. 11, 2013).

74.     Unrest at Loyola over the University's downplaying of campus sexual assault only escalated when students learned that a student-athlete was the subject of an ongoing criminal rape investigation in his hometown for three years while attending Loyola. *See* The Washington Post *Outcry at Loyola after students learn athlete accused of rape was enrolled for three years,* Chicago Tribune (Dec. 21, 2016).

75.     The "days of outrage" following media reports of this student's discovered alleged rape and Loyola's silence on the matter included a change.org petition signed by more than 1,200 students which demanded an explanation from Loyola. *Id.*

76.     Also in 2016, the Illinois Attorney General implemented the Illinois Sexual Violence in Higher Education Act, which required Illinois universities "to have a detailed policy that clearly identifies response guidelines, informs student survivors of their rights, develops a process for proceeding with allegations, educates students and faculty on how to prevent sexual violence and makes it possible for students to report information electronically, confidentially or anonymously." This act supported "survivors" without guaranteeing any rights for respondents. *See* Trisha McCauley, *New Regulations Target College Sexual Assaults,* Loyola Phoenix (Sept. 1, 2016).

77.     Notably, the then-Assistant Dean of Students and Title IX Coordinator, Rabia Khan, stated that Loyola was already in compliance with this Act because she "and a few of [her] colleagues helped contribute to the house bill when it was being written." The University complied with the Act by "laying out survivors' rights, having a confidential reporting system and providing

a list of advocates for survivors to contact…" *Id.* In other words, Loyola's policies were victim-centered without guaranteeing proper rights to the respondent from the beginning.

78.     In the months following, Loyola hosted its semesterly "Let's Talk Safely" forum, which employed a question and answer style gathering where students could ask questions about how Loyola handles sexual assault on campus. When one student asked what to do if a friend comes to them with allegations of sexual assault, Mira Krivoshey, who is a "certified sexual assault advocate at the Wellness Center," immediately stated "[t]he first thing to do is believe them," thereby demonstrating the campus-wide approach of believing victims from the inception of the allegations. *See* Chris Hacker and Eileen O'Gorman, *Loyola Shares Resources for Sexual Assault Survivors at Safety Forum*, Loyola Phoenix (Feb. 25, 2017).

79.     This meeting provided information on how to report an assault and resources that are available, including the Wellness Center, which "provides short-term care and support groups for survivors of sexual assault." No indication of care for respondents was mentioned. *Id.*

80.     In response to student dissatisfaction over the sexual assault processes, the University switched from a policy which provided a hearing instead to a gender-biased single-investigator model wherein one investigator gathers all information surrounding a case and renders a finding without a hearing. *See* Michen Dewey and Michael McDevitt, *Sexual Misconduct Investigation Process Draws Criticism,* Loyola Phoenix (Nov. 15, 2017).

81.     However, this policy change still did not remedy the students' dissatisfaction with how Loyola handled sexual assault allegations. Three females came forward and stated that the University failed to properly investigate and provide safeguards for them when they reported that they had all been assaulted by the same man. This was the second allegation of a male assaulting more than one female at Loyola in recent years. Love did not release any information regarding

the allegations to the media, other than the fact that the perpetrator was male. *See* Mary Chappell and Kayleigh Padar, *'They Just Didn't Make It Very Easy For Us': Three Loyola Students Voice Frustrations with Loyola's Sexual Assault Investigation Process,* Loyola Phoenix (Sept. 11, 2019).

82.    Love responded by saying that allegations would be "handled differently moving forward" as the school had recently created the Office for Equity & Compliance, which was developed specifically to handle sexual misconduct complaints. *Id.*

83.    In these instances, the University still attempted to remedy its deficiencies by adhering to the requests of the complainants. When the accused male was sanctioned in the first investigation to community service and writing a paper, the complainant appealed, stating that she did not feel that the punishment was harsh enough. The University responded by increasing the male's sanction to a suspension *Id.*

84.    Just a few days later, Loyola came under fire once again with the media reporting that Loyola had not learned from its past mistakes, stating that Loyola students "deserve a system that won't repeatedly let them down." This article noted that "nearly 70 percent of Loyola's student population is female… That means nearly 70 percent of Loyola's student population is more likely to go through sexual assault, and Loyola should commit to a system built to curb this problem." The article went on to pose the question to Loyola administrators, "who do you want to protect? Do you want to protect survivors of sexual assault and the student body as a whole? Or do you want to protect dangerous perpetrators of sexual violence?" *See* Phoenix Editorial Board, *STAFF EDITORIAL: Too Little, Too Late: Loyola Fails Students When it Comes to Sexual Assault,* Loyola Phoenix (Sept. 18, 2019), available at http://loyolaphoenix.com/2019/09/staff-editorial-too-little-too-late-loyola-fails-students-when-it-comes-to-sexual-assault/.

85. The student outrage has not diminished, as students recently discovered that a student was expelled from Loyola for rape allegations, and then was permitted to walk at graduation. While the University claimed that the male must have snuck into graduation, administrators acknowledged that his name was, in fact, still printed in the graduation booklet. This caused students to speak out yet again about Loyola's historical failure to address sexual assault allegations, stating "they can't just keep ignoring problems." *See* Mary Chappell and Kayleigh Padar, *A Student Was Expelled From Loyola After a Rape Allegation. Then He Walked the Stage at Graduation,* Loyola Phoenix (Feb. 12, 2020), available at loyolaphoenix.com/2020/02/a-student-was-expelled-from-loyola-after-a-rape-allegation-then-he-walked-the-stage-at-graduation/.

86. On information and belief, Loyola faced the threat of bad press, campus unrest, and the loss of federal funding if it failed to find male students accused of sexual misconduct responsible and punish them severely.

87. On information and belief, this direct and constant pressure created an institutional bias against males accused of sexual misconduct, which infected Loyola's processes and procedures as applied to Plaintiff.

88. On information and belief, in the time period leading up to Loyola's adjudication of the Title IX claims against Plaintiff, the internal and external pressure placed on Loyola to aggressively pursue claims of sexual misconduct allegedly committed by males led to an institutional bias in the process based on gender.

## II.    LOYOLA PROSECUTES PLAINTIFF BASED ON ROE'S UNFOUNDED ALLEGATIONS.

### A. Plaintiff

89.    Plaintiff was raised along with three sisters by a single mother in Kansas. Plaintiff's mother was the first in her family to complete a master's degree and she obtained a corporate leadership position while raising her children. As a result of watching his mother, Plaintiff has kept education as a top priority and has aspirations of pursuing a graduate degree.

90.    Growing up with three sisters and watching his mother overcome challenges to obtain a successful career caused Plaintiff to have immense respect for women. Plaintiff became involved in his community through the church and boy scouts and completed his Eagle Scout project in high school by volunteering at a women's shelter that housed domestic abuse survivors.

91.    Plaintiff matriculated at Loyola in September of 2016, at which time Loyola provided him with the policies and procedures related to academic and nonacademic misconduct.

92.    Since matriculating, Plaintiff has maintained a 3.5 GPA and has had a spotless disciplinary record up to this point.

### B. February 11, 2020

93.    On the weekend of February 8, 2020 Plaintiff matched with Roe on the dating app, Bumble. Roe messaged Plaintiff first, as required by the app, and the two engaged in conversation.

94.    Roe's biography on Bumble stated, "me & mary jane are good friends;" Plaintiff and Roe discussed hanging out with each other and smoking marijuana.

95.    From there, the two exchanged Snapchat handles and moved their conversation to Snapchat, where Roe eventually asked Plaintiff "so when are we going to hang out?" Plaintiff proposed going to get food and hanging out at his apartment, to which Roe agreed.

96.     Roe offered to bring marijuana so the two could smoke, but Plaintiff told her that she did not have to. The two discussed going to a restaurant for dinner and decided to get together on Tuesday, February 11, 2020.

97.     On February 11, Plaintiff and Roe planned to get together at 7:00 p.m. However, Roe was running late, so Plaintiff reached out to make sure she was okay and that she was not lost.

98.     Roe finally made it to Plaintiff's apartment around 9:00 p.m. She stated she took the Red Line[5] from campus to Plaintiff's apartment, which is located about 7 miles away from campus, or 30-40 minutes by train.

99.     When Roe got to Plaintiff's apartment, Plaintiff came down to the lobby to sign Roe in. The building allows residents to send visitors directly up, but Plaintiff wanted to come to the lobby to greet her and walk with her to his apartment.

100.     When the two got to the living room of Plaintiff's one-bedroom apartment, Plaintiff asked Roe if she would prefer to go to a nicer sit-down restaurant called Quartinos as it would be a more formal date setting. Roe said she would go to either Quartinos or Portillo's, so they decided on Portillo's due to the fact that it was already getting late.

101.     Plaintiff and Roe talked for about 15-20 minutes. Roe was sitting on the couch and Plaintiff was sitting on his desk chair, about 10 feet away.

102.     Roe stated that she had just come from a student government meeting on the Lake Shore Campus where they discussed recent scandals at the University, specifically the recent story of a male allegedly assaulting three women on campus. Roe stated that she was not in student government, but that her friend worked for the school newspaper and wanted Roe to come to the

---

[5] The Red Line is a public train line in Chicago.

24

meeting with her. Plaintiff and Roe spoke about the incidents, including how the victims deserved better and how important consent is.

103.    Plaintiff and Roe subsequently left the apartment around 9:20 p.m. to walk to Portillo's, about 10 minutes away from Plaintiff's apartment. The two talked on their walk and Roe told Plaintiff that she was from a "ghetto part of Detroit" and that she does not have money to go out to eat all the time.

104.    After ordering, Plaintiff and Roe split the check, both paying for what they ordered, and took the food to go.

105.    On the walk back to Plaintiff's apartment, Plaintiff and Roe discussed using substances. Plaintiff stated that even though he was 21 years old, he did not like to go clubbing. Plaintiff said that he mainly smoked marijuana after working out to go to sleep. Roe, who was 18 years old, stated that she does not drink alcohol frequently, but that she smoked marijuana often because she was able to stay in control when she was smoking.

106.    Upon getting back to Plaintiff's apartment around 10:15 p.m., they ate their food and watched television while talking and getting to know each other better.

107.    At approximately 10:30 p.m., Roe finished eating first and stated that she wanted to smoke marijuana. Plaintiff went to retrieve a vape pen[6] from his closet, which he kept in a container.

108.    The vape had a liquid cannabis oil cartridge in it with three inhalation settings: green was the lightest setting, blue was medium, and red was the highest.

---

[6] A vape pen is a handheld device consisting of cartridge filled with cannabis which outputs vapor instead of smoke.

109.     Plaintiff set the vape to the lowest setting and the two briefly smoked. Roe smoked less than Plaintiff, taking a quick hit and putting the vape down. After that, Plaintiff put the vape back in his closet.

110.     Plaintiff and Roe were sitting on the couch with Roe sitting in the middle of the couch and Plaintiff sitting on her left.  Plaintiff and Roe mutually leaned in to kiss each other. The two continued to kiss for a while. Plaintiff was nervous. He proceeded slowly and carefully.

111.     Plaintiff made a point to ask Roe if she "was good" while they were kissing, and Roe affirmatively said that she was.

112.     Roe indicated that she was enjoying the encounter, as she put one leg over Plaintiff and straddled him while they were kissing, without Plaintiff guiding her in any way. At that point, Plaintiff asked Roe if she wanted to go to his bedroom, and Roe said yes.

113.     Roe walked past Plaintiff and laid down on her back on Plaintiff's bed and Plaintiff followed her. In Plaintiff's room, Plaintiff and Roe continued to kiss on the bed.

114.     Plaintiff then asked Roe if he could perform oral sex on her. Roe said yes and together they removed her pants and shirt.

115.     Plaintiff performed oral sex on Roe for about 5-10 minutes while Roe was lying on her back. She moaned, indicating pleasure.

116.     Plaintiff then asked Roe if she could perform oral sex on him, and Roe said yes. After a few minutes, Plaintiff asked Roe if she wanted to have sex (i.e., sexual intercourse), and Roe said yes.

117.     Plaintiff proceeded to get a condom from his drawer and put it on. He guided himself very slowly because he wanted to make sure Roe was comfortable. There was no indication

that Roe wanted to stop, and Plaintiff made sure to check in on her as they progressed because he wanted her to enjoy herself.

118.     They had sex in various positions – missionary, from behind and lying on the side. Each time they would switch positions, Plaintiff made sure to start slowly. Roe indicated an orgasm and was equally engaged in the consensual encounter.

119.     Plaintiff then asked Roe if he could finish orally and Roe said yes. Plaintiff removed the condom and stimulated himself until ready to ejaculate and then she performed oral sex on him until he was finished.

120.     Afterwards, Roe said that Plaintiff "really knew what he was doing," indicating enjoyment in the encounter. Plaintiff said they could "go again" if she wanted to and Roe said yes, but Plaintiff then realized that it was getting late and told Roe it would be a good idea if she left by midnight since it was a school night and she had to take the Red Line back to campus.

121.     Plaintiff and Roe went back to watching TV in the living room, and they talked more and cuddled on the couch. When it was almost midnight, Plaintiff helped Roe get her things together. He offered to walk her to the Red Line to make sure she got back safely, but Roe said she would be fine.

122.     Plaintiff walked Roe down to the lobby and out to the sidewalk. When they got outside, he kissed her and she said "you're sweet." Plaintiff told Roe to let him know when she got back home safely.

123.     Plaintiff went to sleep shortly after and didn't hear from Roe before he went to bed, but figured that Roe just forgot to message him when she got back.

124.     The next day, Plaintiff messaged Roe "hey" on Snapchat, but realized that she had removed him as a friend. Plaintiff was hurt because he thought things went well and wanted to see

her again. Plaintiff figured that Roe was "ghosting"[7] him and he wanted to move on from the embarrassment. He removed her name from his contacts on Snapchat and unmatched with her on Bumble where they had originally met.

### C. Loyola's Investigation Plagued with Bias.

125.    Despite Roe's verbal consent, physical reciprocation, and statement that Plaintiff was "sweet" before she left, Roe completely changed her story after leaving Plaintiff's apartment and decided to pursue a smear campaign against Plaintiff, accusing him of nonconsensual sexual penetration.

126.    On information and belief, Roe is very involved in the #MeToo movement and has reposted dozens of times, both before and after the encounter with Plaintiff, anti-male rape statements on her twitter account.

127.    On information and belief, Roe identifies as bisexual and posted a photo on Valentine's Day, just three days after her encounter with Plaintiff, stating she was looking for a girlfriend.

128.    Roe used her encounter with Plaintiff in order to bolster her own credibility amongst her LGBTQ community, which is collectively very involved in the #MeToo movement.

129.    On or about February 21, 2020, Plaintiff received a Notice of Investigation from Courtney Bilbrey, the Assistant Dean of Students and Title IX Deputy Coordinator, stating that Roe had filed a complaint alleging that Plaintiff "engaged in non-consensual sexual penetration against [Roe] on 2/11/2020, at [Plaintiff's] off-campus apartment."

130.    In accordance with Loyola's policy, Brian Houze, the investigator assigned to the case, would be both the investigator <u>and</u> adjudicator of Roe's claims against Plaintiff.

---

[7] "Ghosting" is the practice of ending a personal relationship with someone suddenly and without explanation by withdrawing from all communication.

131.    In addition, Loyola does not require witness interviews to be recorded, and no such recordings were ever provided. Instead, Houze prepared summaries of the interviews after the fact. As such, there is no objective record of the witness statements, and no concrete way to know whether witnesses may have made exculpatory statements which were excluded from the "summary," resulting in a dangerous potential for abuse.

132.    On or about March 6, 2020, Roe met with Houze in person for her first of two interviews. Roe told Houze that she went to Plaintiff's apartment under the assumption that they were hanging out as "friends," leaving out the fact that they met on Bumble Date.[8] Roe entirely skipped over her verbal and physical acts of consent and left glaring inconsistencies in her statements.

133.    On information and belief, at the March 6 meeting, Roe's account of the alleged sexual assault was as follows:

a.    Plaintiff and Roe met on February 11, 2020 on the dating app and engaged in friendly conversation where Plaintiff made a joke about marijuana. Roe stated she thought there was a "possibility for friendship" and did not believe that any flirting was occurring.

b.    Plaintiff invited Roe to get food at Portillo's and go to his apartment to hang out. According to Roe, she arrived at Plaintiff's apartment at 7:45pm, where they engaged in friendly conversation and then eventually walked to Portillo's to get food.

c.    Upon arriving back at Plaintiff's apartment, Roe stated she was sitting with her legs crossed, arms crossed, facing forward away from the Plaintiff. According

---

[8] Bumble has a separate "Bumble BFF" setting in which one can look for friends.

to Roe, Plaintiff put his arm around Roe and pulled her body towards him and that there was no verbal conversation during this contact.

d.  She stated that Plaintiff grabbed her face to pull her head up towards him and that she attempted to pull her body away as he kissed her. Then he pulled her legs onto him and told her to kiss him while he pulled her head. Roe stated she felt like a "ragdoll."

e.  Roe stated that Plaintiff pulled Roe by her belt loops, took off her shirt and carried her to his bedroom, where he got on top of her, took off her pants and penetrated her.

f.  Roe stated that she said "ow" at one point because she was not aroused, and the penetration caused her pain.

g.  She then stated that Plaintiff at one point put his hands on her neck and put her in a choke hold. Roe stated that he then took her to the bathroom and penetrated her there, before taking her back to the bedroom and making her finish orally.

h.  She stated that she put on her jeans and after about 10 minutes, Plaintiff took Roe into his bedroom again, took off her pants, and penetrated her again.

i.  Afterwards, Roe stated she told Plaintiff she had to leave so she could study. She stated she thinks Plaintiff tried to kiss her when he walked her outside, and then she called an Uber.[9]

j.  Roe stated that on the ride home around 11:45 p.m., she texted a friend to ask if they could talk on the phone. When she got back to her dorm, her roommates

---

[9] Roe provided no Uber receipt of the trip back to campus.

were both asleep, so she went to the common room of her dorm, where she saw Witness 1 and told her what happened.

134. This interview with Roe was done just prior to the University's evacuation due to the COVID-19 pandemic. On March 12, 2020, the day before the University's evacuation, Plaintiff emailed Love, stating that "[m]y advisor suggested we discuss with you potential dates for rescheduling the interview for after completion of this semester when we may be allowed to return to campus. *It is very important to me to meet with you in-person, as the complainant has already done*, and to have my advisor in attendance with me." (emphasis added).[10]

135. On March 15, 2020, Plaintiff's attorney also emailed Love, stating "we must reschedule the interview for a time during the week when all students are permitted to travel and return to campus such that [Plaintiff] and his advisor may meet with you in person."

136. After numerous emails sent to Love, he finally responded to Plaintiff on March 19, 2020, denying Plaintiff's request to postpone the interview and directing Plaintiff to meet with the investigator the following week.

137. On or about March 27, 2020, Houze interviewed Witness 1, who reiterated that Roe stated she was assaulted, and that Roe spoke with Campus Safety and then went to the hospital. Witness 1 stated that she and Roe were at the hospital for 12 hours and that Roe had a SANE exam.[11] Roe had not stated any of the foregoing during her interview with the investigator.

138. Plaintiff met with Houze for three interviews which all had to be conducted remotely: March 31, 2020; April 7, 2020; and April 21, 2020. Plaintiff told Houze about his

---

[10] Loyola policy states, "[m]eeting in person with a party is the preferred formation for an investigative interview. However, alternative arrangements may be requested of the investigator to use available technology to allow remote interviews, *when doing so would not compromise the fairness of the investigation.*" (emphasis added).
[11] No medical records of a SANE exam were ever provided to the investigator.

encounter with Roe and that it was entirely consensual and there was no force or coercion ever used. In other words, Roe's entire story was fabricated.

139.    Due to the fact that the interview was held remotely, Plaintiff was not permitted to be in the same room as his advisor, like Roe was in her first interview. During this interview, Plaintiff struggled with the investigator's Zoom feed freezing and dropping audio. Nevertheless, Houze stated Plaintiff appeared scripted and coached during the interview and that Plaintiff's apparent preparation casted doubt on the truthfulness of his statements.

140.    Notably, Houze dismissed Plaintiff's testimony that he and Roe had a lengthy discussion about the importance of sexual consent in response to Roe's attending of the student government meeting as "not germane to the policy allegations."

141.    Plaintiff also submitted more than two dozen questions for Houze to ask Roe and witness 1. The investigator only posed 3 of the questions to Roe and none to her witness.

142.    In a subsequent interview with Houze, Roe's story continued to be made up of contradictory statements in response to information provided by Plaintiff in his interview. For instance, but not limited to, the following:

    a.  Roe denied consuming any marijuana while at Plaintiff's apartment, but rather stated that she only "pretended to hit" the vape.

    b.  Roe denied that Plaintiff performed oral sex on her early on in the sexual encounter. She later stated that Plaintiff never asked for her consent, but rather just started performing oral sex on her.

    c. Roe stated that she has an application called Life360 on her phone which tracks her location and travel routes, and that she planned to submit screenshots to corroborate her account.[12]

143. Following this interview, however, Houze did not collect the Life360 information, key swipe records, the campus safety report, police report, medical records, or Uber receipts to corroborate Complainant's story. All of this information had to be requested by the Plaintiff before it was included in the Preliminary Investigation Report.

144. On or about May 4, 2020, the Preliminary Investigation Report was completed. Roe's Life360 screenshots and key swipe records which were included in the report only emphasized the inconsistencies in her statements. For example:

    a. According to Roe's screenshot, she arrived back at her dorm at 12:14 a.m. However, key swipe records indicate that she did not swipe into her building until 1:14 a.m. Roe provided no explanation of where she was in that hour. Furthermore, Roe provided no explanation for what occurred between 1:14 a.m and 2:58 a.m. when Campus Safety was called.

    b. Roe was transported to the hospital at 4:40 a.m. Witness 1 stated that she and Roe were at the hospital for 12 hours. However, key swipe records show that Roe and Witness 1 swiped into the dorm at 10:05 a.m. on February 12. This accounts for only 5 hours, not 12 hours.

    c. Roe's Life360 screenshots show that she arrived at Plaintiff's apartment at 8:58 p.m. on February 11. However, Roe claimed that she arrived at 7:45pm.

---

[12] Life360 is an app designed to track the user's location and share it with a specified circle of friends. The app allows a user to send an "SOS alert" to their circle of friends if the user feels in danger. Notably, this SOS feature was not used at any point to indicate that Roe felt in danger.

    d.   Notably, Roe submitted photos of red marks on her neck to the Investigator. Roe claimed that she took the photos around 1:00 a.m. after she talked to the RA and Campus Safety about the incident. However, the RA and Campus Safety did not receive phone calls about the incident until 2:55 a.m. and 2:58 a.m., respectively. Furthermore, Roe did not swipe into her dorm building until 1:14 a.m. The unexplained gap of one hour between the Uber ride and entry into her dorm and another two hours which were unaccounted for before she contacted Campus Safety call into question how and when this redness was obtained on her neck.

145.    On or about May 20, 2020, Roe was interviewed for a third time and a supplemental report was issued on June 1, 2020. In each interview, Roe continued to markedly contradict her previous interviews. The inconsistent versions of her story and outright falsehoods about the timeline speak to Roe's lack of credibility and underscore her fictitious allegations that the sexual encounter had not been consensual. For example:

    a.   Roe failed to state her reasoning for attending the February 11 student government meeting was *only* for the segment relating to Loyola's communications protocol for alleged sexual assaults. The published minutes from the meeting note that Roe's friend, who Roe would later appoint as her advisor, spoke at the meeting regarding the use of timely warnings[13] and the crime log.[14]

---

[13] Timely warnings are written notices sent out to notify members of the University community of serious crimes that occur on campus that may pose a serious threat to the community.

[14] The crime log is an archive of all crimes reported to University Campus Safety.

b. Roe failed to tell the investigator about her conversation with Plaintiff about the student government meeting and their agreement of how important consent is.

c. Roe, in response to the various inconsistencies in her alleged timing of events and her Life360 screenshots, stated that the geographic data for Life360 is not accurate, despite the fact that she provided these screenshots as evidence of her whereabouts. There were instances in which the supplemental report noted that Life360 is inaccurate, but this was only where the screenshots contradicted Roe's statements.

d. According to Roe's screenshots, there was a 20-minute unaccounted for gap of time after the student government meeting, which ended at 7:03 p.m. Roe, for the first time, tried to explain this discrepancy by stating she went to "see her [male] friend off" that had been visiting her for a few days prior. However, Loyola freshman policy states that students are not allowed to have overnight guests of the opposite gender. Unless Roe violated the rules by having one of her other male friends sign this visitor in, it is likely that this friend was staying off-campus. In that case, it is unlikely that Roe would have had time to go from the meeting to an off-campus location in Chicago, interact with this friend, and go back to campus all in 20-minutes. If she did, she conveniently did not provide a Life360 screenshot of this location.

e. Roe further stated, for the first time, that she did not take the Red Line but instead, from 8:15 p.m.-8:40 p.m., she claimed she took an Uber to Water Tower Campus where she went to Chick-Fil-A to get a drink and walk around before going to Plaintiff's apartment. This account is contradicted by the fact

that her Life360 screenshot shows that she was traveling at 87 miles per hour on the highway to Plaintiff's neighborhood and arrived at 8:14 p.m., about 30 minutes before she went to Plaintiff's apartment. Roe provided no Uber documentation, and it is highly improbable that an Uber would be traveling at 87 miles per hour. Further, as she was already two hours late, it is doubtful that she would go to Chick-Fil-A for a drink, alone, when she knew she was going to dinner with Plaintiff.

f. Roe stated that she texted her friend about getting a textbook at some point during the night, without providing timestamps of the message. If this text was sent at any time while she was at Plaintiff's apartment, this would demonstrate that she was not in danger as she made no mention of the encounter in her messages.

g. To account for the hour gap of time between when she arrived on campus and when she swiped into her dorm, Roe later claimed that she actually went to see a male friend in another dorm building for that hour, but disappeared to be "alone in the bathroom" for most of the time she was there. This male friend was never formally interviewed by the investigator, however text messages evidence that the friend texted Roe stating, "Yo! Wya"[15] on February 12, to which Roe responded she was in the hospital. He then replied, "I hope you feel better," indicating he thought she was sick, indicating no knowledge of an alleged sexual assault.

---

[15] "Wya" is shorthand for "where you at."

h. Roe claimed she swiped into her dorm at 1:14 a.m. and immediately encountered Witness 1 in the hallway, but key swipe records later showed Witness 1 did not enter their dorm until 2:03 a.m., again contradicting Roe's claimed timeline with approximately one hour unaccounted for.

i. Roe also stated that she had a SANE exam done at the hospital, and that it took "about 10 minutes." SANE exams are a lengthy process which would take much longer than 10 minutes and would produce a report, which was never provided to the Investigator.

146. All of the foregoing inconsistencies were pointed out by Plaintiff in his written response to the supplemental report. Nonetheless, Houze chose not to investigate or resolve any of the inconsistencies and contradictions in Roe's testimony.

147. Furthermore, Roe's advisor sent a request to Plaintiff to follow him on Twitter which was in violation of the no contact directive between Roe and Plaintiff. Plaintiff informed Loyola of this in his response to the supplemental report as well, but no action was taken by the University.

148. Following this, Houze issued a decision later dated June 24, 2020 wherein Houze informed Plaintiff that he had been found responsible for non-consensual sexual penetration. Houze only provided a single sentence for his rationale, stating that supporting evidence for Complainant's story outweighed supporting evidence for Plaintiff's story without giving any specific instances of such evidence.

149. On July 6, 2020, Plaintiff appeared for his sanctioning hearing with Stacey Jaksa, Director of Student Conflict and Conflict Resolution. Plaintiff reiterated his innocence, the flawed investigation, as well as his informal resolution which included completing his courses online

while back home in Kansas in light of the COVID-19 pandemic and never returning to Loyola's campus.[16]

150.    Jaksa, ignoring Loyola's procedural inadequacies and discarding Plaintiff's informal proposal, issued a letter to Plaintiff on July 14, informing Plaintiff that he was suspended from Loyola effective July 14, 2020 to May 9, 2021. The letter did not include any rationale behind the sanction.

151.    Plaintiff requested a reasonable extension of the five day deadline to submit an appeal of the finding and sanction.

152.    Upon information and belief, Plaintiff's reasonable request for an extension to the arbitrary and capricious five (5) day deadline to submit an appeal was denied by Love in an effort to rush through the appeal adjudication such that Loyola would conclude the process prior to the August 14, 2020 effective date for the new Title IX Final Rule.

153.    Plaintiff timely appealed the decision on July 24, 2020 based upon "(1) a substantial procedural error or bias that significantly impacted the investigative findings or administrative resolution; and (2) the assigned outcome is disproportionate to the violation" as mandated by Loyola policy. On July 29, 2020, Plaintiff timely submitted a response to the complainant's appeal in which the complainant sought to increase the sanction imposed.

154.    The appeal board dismissed Plaintiff's appeal and upheld the original decision and suspension. Additionally, the appellate board made the outcome decision retroactive with the suspension imposition effective date July 14, 2020, denying Plaintiff six (6) academic credits, with accompanying loss of tuition, for two courses which Plaintiff had already completed when the appeal decision was rendered on August 6, 2020.

---

[16] On information and belief, this informal resolution was never presented to Roe.

155.     The appeal decision stated the appeal board's rationale had included, among other deficiencies, that the evidence which Plaintiff stated the investigator failed to collect was not relevant to the case. The alleged policy violation was nonconsensual sexual penetration. The requested evidence included medical documentation of the complainant's claimed SANE report, which the appellate board determined was irrelevant.

156.     Plaintiff has exhausted all available avenues for appeal under Loyola's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

### III.     AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT LOYOLA UNIVERSITY-CHICAGO

157.     Upon Plaintiff's matriculation to Loyola, Plaintiff and Loyola became mutually bound by the "Loyola University-Chicago Comprehensive Policy and Equitable Resolution Procedures for Discrimination, Sexual Misconduct, and Retaliation" document ("the Policy"), which is the applicable policy for Loyola's Title IX procedures.

158.     On information and belief, the Policy is updated and/or revised each new school year.

159.     On information and belief, the Policy and/or the various provisions contained therein are available online through the Loyola University-Chicago website.

160.     In response to the local and federal pressure for failing to protect female accusers or take a strong stance against sexual assault against males, Loyola applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females.[17]

---

[17] Loyola has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

161.    The Policy contains and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Loyola University-Chicago.

162.    Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

163.    The Policy describes certain prohibited conduct, including different types of sex discrimination and sexual misconduct. Moreover, the Policy states that "the University *meets or exceeds the requirements of federal and state civil rights laws and regulations* to provide for a prompt, fair, and equitable administration process to respond consistently and effectively to allegations of discrimination, sexual misconduct, and retaliation." (emphasis added).

164.    According to the Policy, "meeting in person with a party is the preferred format for an investigative interview. However, alternative arrangements may be requested of the investigator to use available technology to allow remote interviews, *when doing so would not compromise the fairness of the investigation*." (emphasis added).

  a.  Loyola violated the Policy because Love denied Plaintiff the ability to be interviewed in-person after Roe had already had her interview in-person.

  b.  This compromised the fairness of the investigation as the Plaintiff was forced to have his interview in, and thus have his credibility analyzed under, different circumstances than Roe.

  c.  Furthermore, Houze failed to note or even account for the fact that Roe and the Plaintiff had their interviews conducted in completely different settings and under different circumstances when assessing the credibility of the parties.

165. Pursuant to the Policy, "no individual materially involved in the investigation or resolution of a complaint may have or demonstrate a conflict of interest or bias towards either complainants or respondents generally, or towards any specific party."

     a. Loyola violated the Policy because, on information and belief, the Title IX administrators were partial and biased.

     b. Defendant had a vested interest in finding Plaintiff responsible as a male accused to attempt to redeem its reputation in response to years of harsh criticism and student outrage regarding Loyola's perceived failure to punish male respondents accused of sexual misconduct (as well as Love's own personal failure in losing a student's sexual misconduct report) and was therefore both partial and biased.

     c. Moreover, because Houze served both as the investigator and the adjudicator, he was biased by certain irrelevant and inadmissible evidence discovered during the investigatory phase.

166. The Policy states, "[t]he investigation phase includes the *thorough and impartial collection, review, and analysis of all available evidence* by one or more impartial investigators, and concludes with the investigator making a finding of either "responsible" or "not responsible" for each alleged violation based on the application of the Comprehensive Policy to the evidenced facts." (emphasis added).

     a. Loyola violated the Policy by failing to collect any evidence that was not specifically requested by the Plaintiff, and, once collected, the investigator failed to synthesize all available evidence in his rationale for finding the Plaintiff responsible. For example, in the Preliminary Investigative Report, the

Investigator failed to collect Chicago P.D. reports, Uber receipts to substantiate Roe's timeline, hospital/medical documentation, emails, and Loyola timely warning[18] in order to corroborate Roe's story.

167.   According to the Policy, "[u]pon conclusion of the investigation, the investigator converts the [preliminary investigation report] to a comprehensive final investigation report ("FIR") by including a *thorough credibility assessment of the parties and witnesses* and a balanced analysis of the facts as supported by available evidence. Credibility determinations may not be based in any way on an individual's mere status as a complainant, respondent, or witness." (emphasis added).

   a.   Loyola violated the Policy because the Investigator did not provide a thorough credibility assessment of the parties, but rather relied on the parties' status as a female complainant and male respondent, as evidenced by the Investigator's one sentence rationale.

   b.   The Investigator did not provide any facts to support his finding that Roe was credible and the Plaintiff was not, but rather he relied on his preconceived notion of Plaintiff's guilt. The Investigator further failed to explain his finding of credibility for Roe despite her continually changing story.

168.   According to the Policy, "[t]he FIR concludes with the investigator's findings, based on the investigator's professional expertise and understanding of the Comprehensive Policy as applied to the relevant facts under a preponderance of the evidence standard."

   a.   Loyola violated the policy because the Findings were plainly against the weight of evidence.

---

[18] Loyola never issued a timely warning after receiving Complainant's allegations.

b. Roe told numerous versions of the night of the alleged incident, and even sought to discredit Roe's own Life360 screenshots when it became clear that the accounts were incompatible. Employing a "trauma-informed" investigatory process, the Investigator disregarded all of the blatant evidence underming Roe's credibility as simply an error, presuming Roe to be truthful and seeking to conform the evidence to the preconceived conclusion.

c. The Investigator refused to investigate other relevant witnesses, such as the friend that Roe was allegedly with immediately before or after the reported incident.

d. All in all, the Investigator relied on preconceived notions about female complainants and male respondents, and, rather than evaluating the evidence, simply distorted the evidence to support the predetermined outcome and disregarded or discounted all evidence incompatible with that conclusion.

## IV.    **PLAINTIFF'S DAMAGES**

169.    As a direct and proximate result of Defendant's biased, illegal, negligent and improper conduct, an erroneous finding that Plaintiff engaged in Non-Consensual Sexual Penetration has been made part of Plaintiff's educational records and a permanent notation has been made on his transcript. These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to another school, or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex-

criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

170.    By improperly suspending Plaintiff with only 9 credits left to complete his degree and placing a permanent notation on his college transcript, Loyola has damaged Plaintiff's future education and career prospects. Specifically, as a result of Loyola's actions, Plaintiff will be forced to disclose and explain to potential employers and any undergraduate or graduate school to which he may opt to apply that he was disciplined by Loyola for sexual misconduct.

171.    In the wake of the powerful #MeToo movement, schools and employers will not be clamoring to hire or admit someone who has been found responsible for sexual assault.

172.    Due to Defendant's biased, illegal, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

173.    Due to Defendant's biased, illegal, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

174.    Due to Defendant's biased, illegal, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

175.    Due to Defendant's biased, illegal, negligent and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

176.    Due to Defendant's biased, illegal, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
### Erroneous Outcome

177.   Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

178.   Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

179.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Loyola University-Chicago.

180.   On information and belief, Loyola receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

181.   Title IX is enforceable through a private right of action.

182.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

183.   Under the 2001 Title IX Guidance, which was relied upon by Loyola officials at the time of their decision finding Plaintiff responsible, the "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present

witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

184. According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

185. According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

186. Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

187. Loyola University engaged in gender bias in its Title IX proceedings. Plaintiff was innocent and wrongly found to have committed a violation of Loyola's policies, and gender bias was a motivating factor.

188. Loyola failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint because, by way of example and not limitation:

    a. **Failure to provide equitable in-person interviews for both parties**: The University denied Plaintiff's requests to have the same opportunity as Roe to have an in-person interview. The University then held Plaintiff's preparation for such serious allegations against him. Moreover, the Investigator failed to discern in his analysis that the interview environments had not been the same for both parties and had been advantageous for Roe, which was a critical

omission regarding the credibility assessment and a demonstration of bias by the University;

b. **Failure to properly investigate and collect all available evidence:** The Investigator failed to collect *any* evidence which was not specifically requested by Plaintiff and once collected, failed to synthesize all available evidence in his rationale for the finding. In the preliminary investigative report, the Investigator failed to collect Chicago P.D. reports, Uber receipts to substantiate Roe's timeline, hospital/medical documentation, emails, and Loyola timely warning. Instead of seeking this evidence to corroborate Roe's story, the Investigator merely took her statements at face value;

c. **Failure to ask Roe questions that would negatively impact her credibility:** Plaintiff submitted a total of 28 questions to the investigator to ask Roe and her witness. However, only 3 of these questions were ever asked by the Investigator. These questions concerned Roe's interactions with Plaintiff, yet the investigator dismissed the questions as "not germane to the policy allegations." Consequently, the Investigator failed to interview three additional witnesses named by Roe, corresponding with one witness via email to ask only vague questions which were not answered. Additionally, in response to the preliminary investigative report, Plaintiff asked the investigator 16 additional questions requesting further investigation to which he did not directly respond;

d. **Failure to investigate the changing and exaggerated claims by Roe:** The Investigator demonstrated a complete disregard for the inconsistencies in Roe's and her witness' statements when making assessments of fact and credibility.

Instead, the Investigator deemed Roe's changing story as credible over the unwavering story of Plaintiff. None of these inconsistencies were ever questioned by the Investigator. For example:

i. The Investigator failed to question Roe about the reason she had been documenting her exchange with Plaintiff from the very beginning, and why select messages – such as Plaintiff's concern for her whereabouts and safety – were omitted in the thread of text messages submitted by Roe;

ii. Roe failed to produce any documentation of her alleged Uber ride to Plaintiff's apartment or what she was doing going to get a soft drink before going to Plaintiff's apartment when she was already 2 hours late, further adding to the questions of credibility regarding Roe's account;

iii. Roe stated she had been with a "male friend" prior to arriving at Plaintiff's apartment, but refused to provide his name to be interviewed, even though he was the person Roe was with immediately prior to arriving at Plaintiff's apartment. Roe failed to disclose this in any of her prior interviews;

iv. Roe failed to disclose smoking marijuana while at Plaintiff's apartment until after Plaintiff stated during his interview that he and Roe had both briefly smoked;

v. Roe had her phone with her the entire time she was at Plaintiff's apartment, yet did not produce any text messages from that time and

claimed to not have contacted anyone despite her claims that she was assaulted;

vi. Roe lied about her whereabouts following her encounter with Plaintiff, changing the story of where she went afterwards multiple times;

vii. Roe originally claimed that she immediately ran into Witness 1 upon entering her dorm. However, records show that Witness 1 did not swipe into the dorm until one hour after Roe swiped in;

viii. Roe claimed she had red marks on her neck following her encounter with Plaintiff, yet left 3 hours unaccounted for until she contacted her RA with her allegations (in which those red marks likely arose);

ix. Witness 1 claimed she and Roe were at the hospital for 12 hours, yet records show they were only at the hospital for 5 hours;

e. **Failure to apply the preponderance of the evidence standard:** the Investigator failed to weigh all the evidence and to do so in an equitable manner, rather he used trauma-informed techniques[19], allowing Roe to explain away her inconsistencies and taking her statements at face value.

f. **The "rationale" for the finding of responsibility was not substantiated by facts or evidence:** the entire rationale for finding Plaintiff responsible consisted of one sentence, and provided no substantiation for the Investigator's decision to find Roe's lies and omissions credible over Plaintiff's honest, unwavering statements.

---

[19] *See Equity-Based Discrimination and Misconduct Services (including Title IX),* Office of the Dean of Students, available at https://www.luc.edu/csaa/about/equity-baseddiscriminationandmisconductservicesincludingtitleix/.

189.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

a.    The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

b.    Internal pressure from the student body and/or media after years of harshly criticizing Loyola for its alleged failure to sufficiently prosecute and punish male students and/or faculty accused of sexual misconduct, including widespread student outrage just before the prosecution of allegations against Plaintiff in February 2020;

c.    Pressure upon Love and the entire Office of Compliance to make up for losing a student's complaint in 2016 and subsequently having students demand his termination from the University;

d.    Defendant's refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to interview the friend whom Roe saw in the friend's dorm building upon arriving back on campus;

e.    Defendant's distortion of the evidence to fit Roe's nebulous narrative, rather than impartially evaluating the facts of the case;

f.    Defendant's refusal to afford Plaintiff the same interview setting as Roe. Roe was able to be interviewed in-person with her advisor present, and Defendant refused to account for this difference in setting in the synthesis of evidence;

g. Defendant's failure to afford Plaintiff the presumption of innocence, as such would require Defendant to view equivocal evidence in favor of Plaintiff, which they did not do;

h. Defendant's failure to properly apply the preponderance of the evidence standard; and

i. Defendant's refusal to apply the particular facts of the case in considering the appropriate Sanction, including the fact that the upcoming semester was to be held remotely and thus Plaintiff posed no "danger" to campus.

190. On information and belief, Loyola's mishandling of the complaint was informed by internal institutional pressure, ongoing OCR investigations into noncompliant universities, and the threat of recission of federal funds.

191. On information and belief, Loyola has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

192. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

193. This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

194. As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive

relief directing Loyola to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972**
**Selective Enforcement**

195.　Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

196.　Loyola violated Title IX through gender-biased selective enforcement in Plaintiff's case. *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) (selective enforcement claim asserts "that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.") *Accord　Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *9 (M.D. Tenn. Sept. 30, 2019) ("'To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender.'" (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016)).

197.　Loyola engaged in selective enforcement under Title IX because, on information and belief, as compared to the number of female students accused to sexual misconduct, the number of male students whose cases are formally investigated and adjudicated is greater.

198.　To the extent that any females accused were subjected to disciplinary hearings and found responsible, the sanctions issued were far less severe than those issued to comparable male respondents. These allegations are alleged upon information and belief because Plaintiff was

unable to locate any date relating to the gender of students accused of sexual misconduct who were formally investigated, found responsible and received sanctions.[20]

199.    However, as alleged by Plaintiff *supra*, Loyola engaged in a Title IX compliance strategy which targeted male students and sought more severe discipline against them. This is supported by anecdotal evidence,

200.    Plaintiff received a harsher sanction than a similarly situated plaintiff of a different gender would have received. The severity of the penalty was motivated by gender bias. Jaksa issued an unduly severe sanction against Plaintiff, without considering the following non-exhaustive mitigating factors: i) Plaintiff was a senior at Loyola, with no prior disciplinary history; ii) Plaintiff abided by Roe's request for no further contact, without issue, despite Roe's attempts to violate the no contact order through her advisor; iii) Plaintiff cooperated fully in the conduct process; iv) the matter did not involve multiple claimants or multiple policy violations; v) given that the upcoming semester was to be held entirely online due to the COVID-19 pandemic, a sanction of suspension would not legitimately serve to separate the parties; and vi) given that Plaintiff only had 9 credits remaining in his degree and was set to graduate following upcoming online semester, there was no reasonable likelihood of future conduct code violations.

201.    In issuing a more severe sanction against Doe as a male respondent than was historically assigned to, or would have been assigned to, a female respondent, Loyola was operating under the fear of the loss of federal funding, criticism from students as to how sexual

---

[20] Accordingly, the information that may support these allegations is exclusively within the University's possession, custody and control and is not publicly reported. *See Trustees of the U. of Penn.*, 270 F. Supp. at 824 (selective enforcement claim could proceed to discovery even though complaint alleged that comparator information in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met Twombly standard).

assaults of female students by male students were handled, and bad publicity concerning sexual assaults.

202.    Accordingly, Loyola violated Title IX through gender-biased selective enforcement in Plaintiff's case.

203.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Loyola to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Breach of Contract**

204.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

205.    At all times relevant hereto, a contractual relationship existed between Plaintiff and Loyola through Loyola's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the University's relevant policies.

206.    Loyola committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

    a.    Failing to provide a fair, impartial, and equitable investigation and adjudication process;

    b.    Failing to provide Plaintiff with an in-person interview so as to not compromise the fairness of the investigation as Roe had already been interviewed in-person;

c. Failing to provide Plaintiff with members of the investigation who were unbiased;

d. Failing to collect and synthesize all relevant evidence;

e. Failing to apply a presumption of innocence;

f. Failing to properly apply the preponderance of the evidence burden of proof;

g. Failing to properly apply the facts to the Policy in determining witness credibility;

h. Failing to properly apply the facts to the Policy by imposing an unduly harsh, unwarranted, and unreasonable sanction.

207. Further, included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992).

208. "[T]he implied covenant of good faith and fair dealing requires a party vested with discretion to exercise that discretion reasonably, with proper motive and in a manner *consistent with the reasonable expectations of the parties*. *Id.* at 1444 (emphasis in original).

209. Loyola breached the covenant of good faith and fair dealing implied in the Policy. Examples of such breach include, but are not limited to:

a. The Investigator's abuse of discretion in declining to ask relevant questions submitted by the Plaintiff for Roe and her witness, dismissing the questions as "not germane to the policy allegations";

b. The Investigator's abuse of discretion in failing to collect relevant, necessary information to conduct a proper investigation including but not limited to text messages from Roe's phone and Uber receipts;

    c. The Investigator's abuse of discretion in failing to interview witnesses who were crucial to determining the credibility of Roe's statements; and

    d. The Appeal Officer's abuse of discretion in dismissing Plaintiff's appeal in which Plaintiff clearly outlined major procedural errors which plagued the investigation and adjudication of the allegations against him;

210. As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

211. Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Estoppel and Reliance

212. Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

213. Defendant Loyola's various policies constitute representations and promises that it should have reasonably expected to induce action or forbearance by Plaintiff.

214. Defendant Loyola made express promises that it would provide a fair and impartial process to resolve any alleged violation of Loyola's Policy. Plaintiff relied on those promises when he made the decision to enroll at Loyola, and such a reliance was expected or should have been expected by Loyola.

215. Plaintiff relied to his detriment on these promises and representations by Loyola.

216.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

217.     Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i) On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Loyola awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Loyola to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) refunded tuition and credit awarded for the three courses Plaintiff was enrolled in at the time of suspension;

(ii) On the second cause of action for Violation of Title IX of the Education Amendments of 1972 Selective Enforcement, a judgment against Loyola awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Loyola to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge

Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) refunded tuition and credit awarded for the three courses Plaintiff was enrolled in at the time of suspension;

(iii) On the third cause of action for Breach of Contract, a judgment against Loyola awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) On the fourth cause of action for Estoppel and Reliance, a judgment against Loyola awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) Equitable relief in the form of an order directing Defendant to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) refunded tuition and credit awarded for the three courses Plaintiff was enrolled in at the time of suspension; and

(vi) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

**Dated:   New York, New York**
**December 9, 2020**

**Respectfully submitted,**

**Nesenoff & Miltenberg, LLP**
**_Attorneys for Plaintiff John Doe_**

By: /s/Andrew T. Miltenberg, Esq.
Andrew Miltenberg, Esq. _pro hac vice admission_
_pending_
Stuart Bernstein, Esq. _pro hac vice admission_
_pending_
Cindy Singh, Esq. _pro hac vice admission pending_
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
csingh@nmllplaw.com

**Law Offices of Damon M. Cheronis**
**_Attorneys for Plaintiff John Doe_**

By: /s/Damon M. Cheronis, Esq.
Damon M. Cheronis, Esq.
The Marquette Building
140 S. Dearborn St., Suite 411
Chicago, Illinois 60603
312-663-4644 (telephone)
312-277-1920 (fax)
damon@cheronislaw.com