JOHN DOE,

     Plaintiff,

    v.

LOYOLA UNIVERSITY-CHICAGO,

    Defendant.

No. 20 CV 7293

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Loyola University-Chicago suspended John Doe for sexually assaulting another student. Doe contends that anti-male bias influenced the university's disciplinary process. He sues Loyola for sex discrimination under Title IX, 20 U.S.C. § 1681, and for breach of contract and promissory estoppel under state law. Loyola moves to dismiss under Rule 12(b)(6). The motion is granted.

## I. Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To survive a Rule 12(b)(6) motion, Doe must allege facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I accept all factual allegations as true and draw all reasonable inferences in Doe's favor, but I disregard legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678. Mere labels or "a formulaic recitation of a cause of action's elements" will not suffice. *Twombly*, 550 U.S. at 555.

## II.    Facts

### A.    Sexual Assault Proceedings Against Doe

John Doe became an undergraduate student at Loyola in 2016. [1] ¶¶ 11, 91.[1] In February 2020, he and another student, Jane Roe, matched on a dating app; they exchanged messages and made plans to hang out at Doe's off-campus apartment. *Id*. ¶¶ 93–95.[2] Roe met Doe at his apartment one night at about 9 p.m., where they spent some time talking before getting dinner; after eating, they sat together on the couch and "mutually leaned in to kiss each other." *Id*. ¶¶ 98–110. According to the complaint, Doe made it a point to obtain Roe's verbal consent before kissing, going to his bedroom, and engaging in consensual sex. *Id*. ¶¶ 111–19. Roe left the apartment just before midnight. *Id*. ¶¶ 120–21.

When she arrived back at her dorm, Roe told a witness that Doe had sexually assaulted her. *Id*. ¶¶ 125, 133, 137. Ten days later, Doe received a Notice of Investigation from Loyola's Assistant Dean of Students and Title IX Deputy Coordinator, stating that Roe had filed a complaint alleging that Doe "engaged in non-consensual sexual penetration" at his apartment. *Id*. ¶ 129. In accordance with

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the complaint, [1].

[2] I authorized Doe to litigate this stage of the case anonymously because his identity is not relevant for now and anonymity prevents the unnecessary disclosure of witnesses' identities. Witnesses, like Roe, have not voluntarily subjected themselves to litigation and the public's interest in the legal issue and how a court resolves it can be satisfied without identifying Doe or Roe.

school policy, Loyola assigned Brian Houze to investigate and adjudicate Roe's claims. *Id.* ¶ 130.

Houze interviewed Roe three times. *Id.* ¶¶ 132, 145. The first interview occurred in person in early March, a few days before Loyola evacuated due to the COVID-19 pandemic. *Id.* ¶¶ 132, 134. Roe told Houze that she had met Doe on a dating app and arrived at his apartment at 7:45 p.m. *Id.* ¶ 133. She said they talked, walked to get dinner, and that after they returned to the apartment, Doe violently sexually assaulted her. *Id.* Roe stated she left the apartment just before midnight; after getting back to her dorm, she went to the common area, where she saw and told the witness what had happened. *Id.* Houze also interviewed the witness, who said Roe told her that she was assaulted. *Id.* ¶ 137. The witness told Houze that Roe spoke with Campus Safety before the witness and Roe went to the hospital for 12 hours, where Roe received a Sexual Assault Nurse Examiner exam. *Id.*

The day before the evacuation, Doe emailed Loyola Title IX Coordinator Timothy Love requesting to reschedule his interview until after the semester, when Doe could meet in person. *Id.* ¶ 134. He wrote: "It is very important to me to meet with you in-person, as the complainant has already done, and to have my advisor in attendance with me." *Id.* Three days later, Doe's attorney emailed Love demanding that the interview be rescheduled so that "[Doe] and his advisor may meet with you in person." *Id.* ¶ 135. Loyola policy preferred in-person investigative interviews with parties but noted that "alternative arrangements may be requested of the investigator to use available technology to allow remote interviews, when doing so

would not compromise the fairness of the investigation." *Id.* ¶ 164. Love denied the request to postpone the interview and directed Doe to meet with Houze the following week. *Id.* ¶ 136.

Houze conducted three remote interviews with Doe in March and April 2020. *Id.* ¶ 138. Doe maintained that the encounter with Roe was entirely consensual and that he never used force or coercion. *Id.* Doe told Houze that he and Roe had a lengthy discussion about the importance of consent because Roe had attended a student government meeting on the matter before arriving at Doe's apartment. *Id.* ¶ 140. Houze eventually dismissed the Doe-Roe conversation about consent as "not germane." *Id.* Houze also concluded that Doe appeared scripted and coached in the interview, and that his apparent preparation casted doubt on his truthfulness. *Id.* ¶ 139. Because the interview was remote, Doe was not permitted to be in the same room as his advisor (as Roe had been for her first interview), and Doe struggled with Houze's video feed freezing and dropping audio during the interview. *Id.* ¶ 139.

Doe submitted more than two dozen questions for Houze to ask Roe and the witness, but Houze posed only three of those questions to Roe and none to the witness. *Id.* ¶ 141. In Roe's second interview, she stated Doe never asked her for consent and said she planned to corroborate her account by submitting screenshots from an app on her phone that tracked her location. *Id.* ¶ 142. The preliminary investigation report included the location screenshots, key-swipe records, the campus safety report, police report, medical records, and Uber receipts. *Id.* ¶¶ 143–44. Houze included this information only after Doe requested it. *Id.* ¶ 143. The records revealed some

inconsistencies in Roe's and the witness's timeline: Roe arrived at Doe's apartment at 9 p.m. (not 7:45 p.m.); her Uber dropped her off at 12:14 a.m., but she did not swipe into her dorm until an hour later; Roe spent five hours in the hospital, not twelve; and Roe claimed she took photos of red marks on her neck (which she submitted to Houze) around 1 a.m. after she talked with the RA and Campus Safety, but the RA and Campus Safety did not receive calls about the incident until just before 3 a.m. *Id*. ¶ 144.

Houze interviewed Roe a third time in May. Roe claimed that some of the geographic data from the app screenshots were inaccurate and testified about some discrepancies in her timeline regarding events before and after her time at Doe's apartment. *Id*. ¶ 145. Roe also stated that she had a sexual assault exam done at the hospital. *Id*. After the third interview, Loyola issued a supplemental report. *Id*. Doe responded to that report and pointed out Roe's contradictions and inconsistencies, but Houze chose not to investigate them further. *Id*. ¶ 146.

In late June, Houze issued a decision finding Doe responsible for non-consensual sexual penetration. *Id*. ¶ 148. His one-sentence rationale was that evidence supporting Roe's story outweighed evidence supporting Doe's story. *Id*.[3] Two weeks later, Doe appeared for his sanctioning hearing with Stacey Jaksa, Loyola's

---

[3] In his brief, Doe states: "Incredibly, Houze's rationale was a single sentence, merely stating that he found Roe more credible than Plaintiff." [19] at 3; *see also id*. at 13 ("Notably, Houze's explanation for the determination was a single baseless sentence which merely concluded that he found Roe more credible than Plaintiff."). But that's not what the complaint says and is not an inference reasonably drawn from the complaint. According to the complaint, Houze stated that "supporting evidence for [Roe's] story outweighed supporting evidence for [Doe's] story." [1] ¶ 148. This alleges that Houze referred to and weighed supporting evidence for both Roe's and Doe's stories and did not simply find one person more credible than the other.

Director of Student Conflict and Conflict Resolution; Doe asserted his innocence, complained of the investigation's flaws, and proposed an informal resolution that would allow him to complete online courses from home while never returning to campus. *Id.* ¶ 149. Jaksa ignored the inadequacies of the investigation and Doe's proposal and informed him that he was suspended from Loyola for the following school year, or from July 14, 2020 until May 9, 2021. *Id.* ¶ 150.

Doe requested an extension of the five-day deadline to submit an appeal, which Love denied in an effort to rush through the appeal before a new, arguably respondent-friendly Title IX rule became effective. *Id.* ¶¶ 57–64, 151–52. Doe and Roe both appealed the one-year suspension; Doe claimed substantial procedural error, bias, and disproportionate punishment, while Roe sought to increase Doe's sanction. *Id.* ¶ 153. The appeal board upheld the original responsibility finding and suspension. *Id.* ¶ 154. Doe stated that Houze had failed to collect Roe's medical documentation and sexual assault examination report, but the board concluded that this evidence was irrelevant. *Id.* ¶ 155.

Doe alleges that Loyola breached a contract—its Comprehensive Policy and Equitable Resolution Procedures for Discrimination, Sexual Misconduct, and Retaliation—by allowing gender bias to taint the proceedings in his case. *Id.* ¶¶ 157, 161–62. Loyola updated the policy each school year, but in response to pressure to better protect female accusers, it applied them "in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females." *Id.* ¶¶ 158, 160.

Doe highlights several provisions of the policy. Loyola committed to provide "a prompt, fair, and equitable administration process to respond consistently and effectively to allegations of discrimination, sexual misconduct, and retaliation." *Id.* ¶ 163. The school preferred in-person meetings with a party, but remote interviews could be requested if they would not compromise the fairness of the investigation. *Id.* ¶ 164. The policy prohibited investigators and adjudicators from having "a conflict of interest or bias towards either complainants or respondents generally, or towards any specific party." *Id.* ¶ 165. Investigations would include "thorough and impartial collection, review, and analysis of all available evidence by one or more impartial investigators" and conclude with a "finding of either 'responsible' or 'not responsible.'" *Id.* ¶ 166. Investigators would convert the preliminary report "to a comprehensive final investigation report" that includes "a thorough credibility assessment of the parties and witnesses and a balanced analysis of the facts as supported by available evidence." *Id.* ¶ 167. And the final report "concludes with the investigator's findings … under a preponderance of the evidence standard." *Id.* ¶ 168.

Doe alleges that Loyola violated the policy several times. Love's denial of Doe's request to be interviewed in person, for instance, compromised the fairness of the investigation because Doe was forced to have his credibility analyzed in a different setting than Roe. *Id.* ¶ 164. Doe alleges that Loyola's Title IX administrators were biased and—because the school and Love faced harsh criticism for its perceived failure to punish male respondents accused of sexual misconduct—had a vested interest in finding him responsible. *Id.* ¶ 165. The complaint alleges that Houze's

mixed role as investigator and adjudicator caused him to become biased by unspecified irrelevant and inadmissible evidence. *Id.* Loyola also violated the policy when it failed to collect evidence until Doe specifically requested that Houze do so, and because Houze failed to synthesize all available evidence in his rationale for finding Doe responsible. *Id.* ¶¶ 143, 166. Houze did not provide "any facts to support his finding that Roe was credible and [Doe] was not," nor did he offer "a thorough credibility assessment of the parties, but rather relied on the parties' status as a female complainant and male respondent, as evidenced by [his] one sentence rationale." *Id.* ¶ 167. In sum, the complaint attacks Houze's findings as against the weight of the evidence and based "on preconceived notions about female complainants and male respondents." *Id.* ¶ 168.

## B. Federal Policy Guidance and Campus Backdrop

### 1. *April 2011 Dear Colleague Letter*

In April 2011, the Department of Education's Office for Civil Rights issued a "Dear Colleague" letter advising federally funded universities that sexual violence constitutes sexual harassment under Title IX and directing schools to take immediate action to address and eliminate such harassment. *Id.* ¶¶ 16–17.[4] The letter encouraged schools to adopt a preponderance of the evidence standard for cases involving sexual misconduct, advised schools to minimize the burden on the complainant, and discouraged cross-examination of alleged victims that "may be

---

[4] *See* United States Department of Education, Office of the Assistant Secretary of Civil Rights, Dear Colleague Letter (2011),
https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html.

traumatic or intimidating." *Id.* ¶¶ 20–22. The complaint alleges that the Department of Education treated the letter—a mere guidance document—as a binding regulation and pressured schools to aggressively investigate sexual assault on campus, which led schools to change their sexual assault policies and procedures. *Id.* ¶¶ 23–25.

Three years after publishing the Dear Colleague letter, OCR issued another guidance document—the April 2014 Q&A—to address campus sexual misconduct. *Id.* ¶ 26. The Q&A included policies and procedures that universities must or should employ to prevent sexual violence and resolve complaints. *Id.* It advised schools, for example, to adopt a trauma-informed approach to hearings that would not inflict additional trauma on the complainant; it also stated that schools "must not require a complainant to be present" during hearings, may eliminate opportunities for cross examination, and must minimize the number of times a victim is interviewed to avoid revictimization. *Id.* ¶¶ 27–28.

In April and June of 2014, the White House and the Assistant Secretary of Education both warned that if OCR found a school in violation of Title IX, the school could face investigation from the Department of Education or the Department of Justice and the loss of federal funds. *Id.* ¶¶ 30–31. OCR hired hundreds of investigators and conducted over five hundred investigations of colleges for allegedly mishandling sexual misconduct complaints. *Id.* ¶ 32. According to Doe, "universities, including Loyola, were fearful of and concerned about being investigated or sanctioned" by the federal government and, in response to government pressure,

"limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases." *Id.* ¶ 38.

### 2. *OCR's 2017 Rescission of the 2011 Letter and 2014 Q&A*

In 2017, OCR rescinded the 2011 letter and the 2014 Q&A and issued interim guidance in the form of another Q&A. *Id.* ¶ 43. OCR said the 2011 letter improperly pressured universities to adopt unfair procedures that were not required by Title IX, stacked the deck against the accused, and lacked basic elements of due process. *Id.* ¶ 44. The 2017 Q&A prohibited universities from applying assumptions that favor complainants over respondents and permitted schools to apply either a preponderance of the evidence standard or a clear and convincing evidence standard when evaluating claims of sexual misconduct. *Id.* ¶¶ 45–46, 50. According to Doe, the 2017 Q&A suggests the policies and procedures Loyola followed in his case—which were tailored to comply with the 2011 letter—were unfair and "contrary to the goal of gender equality." *Id.* ¶ 51.

Loyola refused to change its policies and procedures after OCR issued the 2017 guidance. *Id.* ¶¶ 52, 54. In May 2020, the Department of Education published new Title IX regulations, to take effect August 14, 2020, replacing all previously issued OCR guidance. *Id.* ¶¶ 57–58. The new regulations narrowed the definition of sexual harassment and allowed universities to choose between a preponderance of the evidence standard or a clear and convincing evidence standard. *Id.* ¶¶ 61–62. The regulations also prohibited the use of the single-investigator model that Loyola had employed in Doe's investigation. *Id.* ¶ 63. According to the complaint, Loyola deprived

Doe of several procedural rights under these new regulations, which the school implicitly acknowledged by updating its policies the day before the regulations took effect. *Id.* ¶¶ 64–65.

### 3. Student Pressure on Loyola to Crack Down on Sexual Assault

Just before OCR rescinded the 2011 letter, "Loyola was under heavy fire for its alleged failure to properly respond to and redress female students' claims of sexual assault and sexual harassment by male students and/or faculty." *Id.* ¶ 66. In October 2016, Loyola students called on the university to speak up about sex crimes on campus and asked the school to provide more victim-centered resources to students. *Id.* ¶ 68. The same month, Love, on behalf of Loyola's Office of the Dean of Students, admitted to losing a student's sexual assault complaint, sparking outrage across campus and on social media. *Id.* ¶¶ 69–70. In response, Loyola's Dean of Students vowed to demonstrate the school's commitment to addressing allegations of sexual assault and provided various resources for survivors. *Id.* ¶ 70. Loyola's Title IX Coordinator also stated that the school was in compliance with the Illinois Sexual Violence in Higher Education Act by "laying out survivors' rights, having a confidential reporting system[,] and providing a list of advocates for survivors to contact." *Id.* ¶¶ 76–77.

Protests continued. A group of students interrupted the inauguration of Loyola's new president to protest the school's mishandling of sexual assault allegations; the students marched into the ceremony with their mouths taped shut while holding up a blood-stained sheet stating "silence is violence." *Id.* ¶ 71. The

students issued a statement calling for Love to be fired over the continued mishandling of sexual assault cases, criticizing the incoming president for her record handling sexual assault cases, and demanding a public apology from Loyola for downplaying the growing epidemic of rape culture. *Id.* ¶¶ 72–73. Student unrest escalated following media reports that Loyola allowed a student-athlete to attend the school for three years while he was under criminal investigation for rape in his hometown. *Id.* ¶¶ 74–75. Loyola hosted a forum where students could ask questions about how the school handled sexual assault on campus. *Id.* ¶¶ 78–79. In response to one student's question about what to do if a friend came to them with allegations of sexual assault, a Loyola representative answered, "the first thing to do is believe them." *Id.* ¶ 78. Doe alleges this answer demonstrated "the campus-wide approach to believing victims from the inception of the allegations." *Id.*

To quell student discontent with the school's sexual assault processes, Loyola implemented a single-investigator model: one individual would investigate the case and render a finding of responsibility without a hearing. *Id.* ¶ 80. The complaint asserts that this model is gender biased. *See id.* The policy change did not assuage students' dissatisfaction with Loyola's sexual assault policies and procedures. *Id.* ¶ 81. Three women alleged that they had been sexually assaulted by the same man— the second allegation of a man assaulting more than one woman at Loyola in recent years—and claimed that the school failed to properly investigate and provide safeguards for them. *Id.* Love did not release any information to the public other than that the perpetrator was male, but he vowed that allegations would be "handled

differently moving forward." *Id.* ¶¶ 81–82. When Loyola punished one of the men accused of assaulting multiple women with community service and writing a paper, the complainant appealed, and Loyola enhanced the sanction to a suspension. *Id.* ¶ 83. An editorial in the school newspaper noted that nearly 70 percent of Loyola's student population was female—meaning "nearly 70 percent of Loyola's student population is more likely to go through sexual assault"—and called on the school to commit to protecting survivors of sexual assault and not dangerous perpetrators of sexual violence. *Id.* ¶ 84.

Student outrage had not diminished by February 2020, when the school paper reported that a student expelled for rape allegations was permitted to walk at graduation, causing "students to speak out yet again about Loyola's historical failure to address sexual assault allegations, stating 'they can't just keep ignoring problems.'" *Id.* ¶ 85. Loyola faced bad press and campus unrest if it failed to find male students accused of sexual misconduct responsible and punish them severely, and in turn, this pressure created an institutional bias against men accused of sexual misconduct, including Doe. *Id.* ¶¶ 86–88.

## III. Analysis

### A. Title IX

Title IX bars universities that receive federal funds from discriminating against students on the basis of sex. *See* 20 U.S.C. § 1681(a); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979) (Title IX enforceable through implied private right of action). To state a Title IX discrimination claim, a plaintiff must allege:

"(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019). Only the third element is in dispute.

Doe brings his discrimination claims under "erroneous outcome" (Count I) and "selective enforcement" (Count II) theories. An erroneous-outcome claim requires a plaintiff to show that he "was innocent and wrongly found to have committed the offense," while a selective-enforcement plaintiff must prove that, "regardless of his guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). But these doctrinal tests both turn on whether the alleged facts, if true, raise a plausible inference that the university discriminated on the basis of sex. *See Columbia Coll.*, 933 F.3d at 854–55. At bottom, Counts I and II ask the same question.

Doe sets his discrimination claim against the backdrop of federal and local pressure on Loyola to combat sexual violence. Doe starts with OCR's 2011 Dear Colleague letter.[5] The letter highlighted the prevalence of sexual assault on college campuses and encouraged schools to publish grievance policies and procedures, train employees to report and respond to sexual harassment and violence, appoint a Title

---

[5] Doe makes no argument regarding the 2014 Q&A guidance document in his brief.

IX coordinator, and apply a preponderance of the evidence standard when adjudicating sexual assault cases. *See* United States Department of Education, Office of the Assistant Secretary of Civil Rights, Dear Colleague Letter (2011), at 2, 4, 10–11. Doe argues that "there is no denying that the primary focus was to protect women from sexual misconduct by male students." [19] at 6.[6] The letter, says Doe, effectively required Loyola to adopt compliant disciplinary procedures because failure to do so might result in the loss of federal funds. *Id.*

OCR rescinded the Dear Colleague letter in 2017. Doe alleges that Loyola steered clear of the new federal guidance (the 2017 Q&A) and decided to continue following the procedures it adopted based on the 2011 letter. *Id.* at 7. Doe posits that Loyola refused to update its policies because it faced pressure from students and local media to aggressively pursue claims of sexual assault and to protect female victims. *Id.* at 7, 10. Loyola adopted a single-investigator model in response to student dissatisfaction with the school's sexual assault processes; Doe claims the model was biased against men and "reduc[ed] the rights available to male respondents." *Id.* at 8; [1] ¶ 80.[7] Doe argues that "Loyola was pressured to take an aggressive stance

---

[6] Doe reaches this conclusion because the letter: (1) stated that about 20 percent of women are victims of completed or attempted sexual assault while in college (a figure from a National Institute of Justice Study that Doe disputes); (2) cited the same study for its finding that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol, and (3) noted that the Justice Department's Office on Violence Against Women administers grants to reduce domestic violence, sexual assault, and stalking on campus. [19] at 6; *see also* OCR, Dear Colleague Letter (2011), at 2 n.3, 19 n.46.

[7] In his brief, Doe says that Loyola "adopted the single investigator model in response to female student pressure and protests over the handling of sexual assault claims against male students." [19] at 8 (citing [1] ¶ 80). This introduces sex-based allegations not present in the cited paragraph, which states: "In response to student dissatisfaction over the sexual assault processes, the University switched from a policy which provided a hearing instead to a

against males accused of sexual misconduct" to "repair its reputation for fostering a culture in which male students get away with sexually assaulting female students." [19] at 10.

Campus and federal-government pressure may help a plaintiff tell "a story about why [a university] might have been motivated to discriminate" on the basis of sex. *See Purdue*, 928 F.3d at 669. But here, the complaint's background allegations are not a motive for sex-based bias against Doe. For starters, Loyola faced no threat of federal investigation or loss of federal funds in 2020 for failing to adhere to the rescinded 2011 letter. Whatever federal pressure the Dear Colleague letter placed on schools before 2017, the government had abandoned that policy long before Loyola's investigation of Doe—the school faced zero risk of federal investigation or losing federal funds for failing to comply with the letter. And Loyola had no obligation to adopt new policies in light of the 2017 Q&A guidance. The complaint does not plausibly suggest that failure to do so—a decision that accorded with many if not most other schools—was motivated by gender bias. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30029 (May 19, 2020) (codified at 34 C.F.R. pt. 106) (noting that lack of change in a university's Title IX policies following the 2011 letter's recission "is a reasonable response" because "[g]uidance is not legally enforceable [and] the 2017 Q&A expressly stated to recipients that the 2017 Q&A was issued as

---

gender-biased single-investigator model wherein one investigator gathers all information surrounding a case and renders a finding without a hearing." [1] ¶ 80.

an interim, non-binding interpretation of Title IX sexual harassment responsibilities").

Further, general allegations about the climate at Loyola do not support an inference that the university discriminated against Doe because of his sex. The complaint alleges that "internal and external pressure placed on Loyola to aggressively pursue claims of sexual misconduct allegedly committed by males led to an institutional bias in the process based on gender." [1] ¶ 88. But none of the alleged context suggests that caving to pressure to be aggressive created a bias against men within the decisionmaking apparatus. At most, the complaint raises an inference that students pressured Loyola to find students accused of sexual assault responsible, but a pro-victim bias is not sex bias—both women and men can commit or be victims of sexual assault. *See Johnson v. Marian Univ.*, 829 Fed. App'x 731, 733 (7th Cir. 2020). Finally, whatever the single-investigator model's defects, it is not intrinsically biased against men: "the combination of investigative and adjudicative functions into a single administrator does not, in itself, demonstrate" bias. *Hess v. Bd. of Trustees of S. Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016) (citing *Withrow v. Larkin*, 421 U.S. 35, 47–55 (1975)).[8] Other than conclusory assertions that the model is "gender-biased," Doe has not alleged any facts that plausibly suggest how the model is inherently biased against men.

---

[8] Under the new Department of Education regulations, an investigator cannot be the same person as the decisionmaker. 34 C.F.R. § 106.45(b)(7)(i). These regulations became effective after Loyola's proceedings against Doe and have no retroactive effect. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30061, 30072 (May 19, 2020) (codified at 34 C.F.R. pt. 106).

And even when general background facts adequately allege institutional bias, they still are "not enough to get [Doe] over the plausibility line." *Purdue*, 928 F.3d at 669; *see also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case."). To get over that threshold, Doe must allege specific facts raising the inference that Loyola acted "at least partly on the basis of sex in his particular case." *Purdue*, 928 F.3d at 669. Doe "must plead particularized factual content, not conclusory allegations, that allows the court to plausibly infer the defendant is liable for the alleged misconduct." *Columbia Coll.*, 933 F.3d at 854.

On that front, Doe points to Houze's slipshod investigation to show the requisite bias. Houze, Doe says, applied a trauma-informed approach and failed to: ask Roe questions that would negatively impact her credibility, explore inconsistencies in Roe's story, and interview more witnesses who were with Roe before and after the encounter. [19] at 10–12. Doe submitted two dozen questions for Houze to ask Roe following the preliminary report, but Houze asked her only three. *Id.* at 12. Houze also did not independently collect certain evidence until Doe requested that he do so, and Houze failed to properly apply the preponderance of the evidence standard or substantiate with evidence his rationale for finding Doe responsible. *Id.* at 10–11. Doe contends that Houze seized upon the setting of his interviews—on video calls—to find him incredible and Roe credible, while failing to note that Roe's first interview took place in person. *Id.* at 10 n.1. Doe argues that the investigation was a predetermined sham because Houze blindly accepted Roe's

allegations and Doe's "response to the preliminary report pointing out Roe's inconsistencies and requesting further investigation, … was merely brushed aside, not investigated further, and wholly omitted from the final investigation report." *Id.* at 12–13.

These facts do not, however, lead to a reasonable inference that Loyola suspended Doe because of his sex. Houze's one-sentence rationale does not support an inference that he relied on the parties' gender to make his decision. Recall that the complaint alleges that Houze's single sentence was about weighing the supporting evidence for Doe's and Roe's versions of events. Doe has not plausibly alleged that Love's denial of his request to postpone his interview or extend his appeal deadline had anything to do with his sex. Doe says it was unfair to have his credibility assessed in a different setting from Roe, but both he and Roe were interviewed three times, and Doe alleges only that Roe's first interview was conducted in person. There is no allegation that the university postponed Roe's subsequent interviews so that they could take place in person, or that Loyola sought to interview female witnesses in a more favorable setting than Doe. Doe does not allege that any interviews with Roe and her witness were conducted in person after Loyola's emergency evacuation. There is no reasonable inference that sex bias—and not the pandemic—motivated Loyola's decision to conduct Doe's interviews via video.

In *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), the plaintiff plausibly alleged that university officials credited the female accuser over him based on sex because the school blindly accepted the accuser's account without ever speaking with

her or receiving her written account. *Id.* at 669–70; *see also Baum*, 903 F.3d at 586 (Title IX claim plausible when school's appeals board—without interviewing witnesses—credited exclusively female testimony and rejected all male testimony because the men were fraternity brothers, even as several female witnesses were sorority sisters). When university officials accept a second-hand account reported by someone who has a demonstrated bias, an inference that the university was similarly biased is reasonable. *See Purdue*, 928 F.3d at 669–70. And when a university conceals its preliminary report from the accused, omits favorable evidence, and outright lies about the accused's confession, its behavior is suspicious. *See id.* at 657, 669. Add to that a refusal to allow the accused to present witnesses, including a witness who was in the room at the time of the alleged assault, and an admission that two of the three adjudicators took no evidence into account other than the female student's accusations, and sex-based bias becomes plausible. *See id.* at 658, 669.

None of that happened to Doe. Here, as in *Doe v. Columbia Coll. Chicago*, 933 F.3d 849 (7th Cir. 2019), Doe "was provided with the opportunity to review the investigative materials; was given multiple opportunities to submit evidence; … and submitted questions to be asked of Roe on cross-examination." *Id.* at 856. Doe has not alleged that Houze, Jaksa, Love, or the appeal board failed to review materials or demonstrated bias during his investigation and proceedings. *See id.* Doe has not alleged that any of Loyola's decisionmakers admitted that they took only Roe's accusations into account. And Houze's stated rationale for finding Doe responsible, according to the complaint, was more than a mere credibility determination in favor

of Roe; rather, Houze concluded that the supporting evidence—much of which he collected at Doe's behest—weighed in favor of Roe's version of events. *See* [1] ¶ 148. According to the complaint, that evidence included three separate interviews with both Roe and Doe, an interview with a witness to a contemporaneous consistent statement by Roe, photos of red marks on Roe's neck, and evidence of location data, key-swipe records, the campus safety report, police report, medical records, and Uber receipts. *See id.* ¶¶ 137, 143–44.

Accepting the allegations of the complaint as true, Houze did not blindly accept Roe's story. He asked Roe follow-up questions, including questions submitted by Doe. And while Doe argues that Houze "was biased by certain irrelevant and inadmissible evidence," *see id.* ¶ 165, the Federal Rules of Evidence do not apply to a university's disciplinary proceedings and nothing about poorly calibrated ideas of relevance and admissibility suggests sex bias. Relatedly, Doe's allegations that Houze and the appeal board improperly weighed the evidence in Roe's favor do not imply that their decisions were based on Doe's gender. *See Columbia Coll.*, 933 F.3d at 856.

In sum, Doe's gripes with Loyola's proceedings in his case are "divorced from gender" and do not allege that a woman accused of sexual assault would have been treated any differently than he was.[9] *Id.* at 856.

---

[9] Doe alleges, on information and belief, that "[t]o the extent that any females accused were subjected to disciplinary hearings and found responsible," Loyola applied its policy in a manner that "resulted in harsher penalties for males accused of sexual misconduct as compared to females." [1] ¶¶ 160, 198. Doe acknowledges that this is speculative but claims that he should get the benefit of discovery because this information is exclusively within Loyola's possession. *Id.* ¶¶ 160 n.17, 198 n.20. But even taking this speculative allegation as true, Doe has failed to allege any facts specific to his case suggesting that gender bias motivated his one-year punishment. Doe contends that his punishment was excessive

Counts I and II are dismissed.

**B.      Breach of Contract**

For his breach of contract claim, Doe must allege: "(1) the existence of a valid and enforceable contractual promise, (2) a breach of that promise, (3) plaintiff performed his contractual obligations, and (4) resultant damages." *Columbia Coll.*, 933 F.3d at 858. In Illinois, a "university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 346 Ill.App.3d 728, 732 (2d Dist. 2004). But because courts are reluctant to interfere with academic affairs, "a student's breach of contract claim must involve decisions that were arbitrary, capricious, or made in bad faith," meaning that Loyola "would not be liable even if … it exercised its academic judgment unwisely; rather it must have disciplined a student without any rational basis." *Columbia Coll.*, 933 F.3d at 858. Doe's burden is high: he must show that Loyola "did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of plaintiff." *Id.* (quoting *Raethz*, 346 Ill.App.3d at 733). Doe argues that Loyola violated its own policies during his proceedings and that he has stated a plausible breach-of-contract claim because Loyola's gender bias resulted in an arbitrary decision. [19] at 14–15; [1] ¶¶ 157–68.

_____

because he had no prior disciplinary history, the matter involved only one claimant and policy violation, and Doe was a senior with 9 credits left who cooperated fully with the investigation. *See id.* ¶ 200. None of this indicates that gender motivated his punishment, or that a similarly situated woman found responsible for nonconsensual sexual penetration would have received a lesser punishment.

But because the complaint does not support a plausible inference that Loyola discriminated against Doe based on sex, it likewise fails to raise an inference that Loyola acted arbitrarily. To recap, Houze interviewed Roe's witness, he interviewed both Doe and Roe three times, he gathered other evidence and supplemented his initial investigation report, and he issued a decision based on that evidence that the appeals board upheld. When both Roe and Doe challenged the severity of the punishment, the school upheld its initial suspension of one school year. The complaint does not reasonably suggest that Loyola exercised no judgment in this process, was biased, or somehow acted in bad faith.

Count III is dismissed.

### C.     Promissory Estoppel

To state a claim for promissory estoppel, a plaintiff must allege that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill.2d 46, 51 (2009). A plaintiff may bring a promissory estoppel claim based on promises in a school's policy manual, but "those claims typically arise with specific promises made in the employment context, not the general claims made by a university in its manuals and policies." *Doe v. Columbia Coll. Chicago*, 299 F.Supp.3d 939, 961 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019). Still, a promise within a school's policies and procedures manual may support a promissory estoppel claim "where the promises are 'specific' rather than 'general.'"

*Doe v. Loyola Univ. of Chicago*, No. 18 C 7335, 2019 WL 3801819, at *2 (N.D. Ill. Aug. 13, 2019) (quoting *Doe v. Univ. of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *10 (N.D. Ill. Sept. 20, 2017)). Doe argues that he decided to enroll at Loyola in reliance on Loyola's promises in its policy to provide a fair and impartial process to resolve any alleged violation. [1] ¶¶ 214–15; [19] at 15.

Doe has not identified an unambiguous promise or alleged foreseeable reliance. Doe points to Loyola's commitment to a fair, equitable, thorough, impartial, and comprehensive disciplinary process. *See* [1] ¶¶ 163–68. But commitments "to broad principles" such as these, "without giving specifics about how those goals will be achieved," do not constitute unambiguous promises. *Univ. of Chicago*, 2017 WL 4163960, at *10. Doe argues, for example, that Loyola failed to provide a "thorough" assessment of credibility or a "balanced" analysis of the facts. [19] at 15. But what makes a "balanced analysis" is open to interpretation, could take a variety of forms, and does not constitute a specific, unambiguous promise. *See Univ. of Chicago*, 2017 WL 4163960, at *10 (school policy's commitment to "a prompt, fair, impartial and thorough investigation and resolution" not unambiguous promise).

Doe argues that Loyola "failed to collect all available evidence as required by the Policy until Plaintiff demanded that evidence be collected." [19] at 15. But nothing in the policy states that an investigator must collect all available evidence on his own and without assistance from the parties. And Doe acknowledges that Houze collected the evidence he requested and included it in the preliminary investigation report. [1] ¶ 143. Further, the policy also does not unambiguously promise in-person

interviews—it expresses a preference for that format, but clarifies that alternative arrangements are also permitted so long as they don't compromise the fairness of the investigation. *Id.* ¶ 164. Finally, the context of the Loyola's statements—within a policy manual that it changed every year, *see id.* ¶ 158—further demonstrates that these were not unalterable promises on which Doe foreseeably relied in deciding to attend the university. *See Columbia Coll.*, 299 F.Supp.3d at 961; *see also Univ. of Chicago*, 2017 WL 4163960, at *10 (university's ability to change policy at any time casts doubt on unambiguous nature of statements and "make it clear that his reliance would not have been expected or foreseeable to the University").

Count IV is dismissed.

## IV. Conclusion

Defendant's motion to dismiss, [16], is granted. The complaint is dismissed without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (an initial dismissal for failure to state a claim should be without prejudice, and a plaintiff should be given at least one opportunity to amend his complaint before dismissal with prejudice). Plaintiff has leave to file an amended complaint by July 13, 2021. If an amended complaint is not filed, dismissal will convert to a dismissal with prejudice and the clerk will enter judgment in favor of the defendant.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  June 22, 2021